IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JANE F. WILLIAMS, ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:08cv270 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of ) | |
| Social Security, ) | |
| ) | |
|     Defendant. ) | |

MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), Jane F. Williams ("plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("defendant") denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act ("SSA" or "the Act"), 42 U.S.C. §§ 401-433. The record has been filed and the case is now before the Court on cross-motions for summary judgment.

In her Motion for Summary Judgment, plaintiff contends defendant's decision should be reversed because: (1) the Administrative Law Judge ("ALJ") improperly rejected the treating physician's opinions of disability and assessments of plaintiff's functional limitations; and (2) the vocational evidence relied upon by the ALJ to conclude that plaintiff is able to perform a significant number of jobs omits consideration of her functional

1

limitations.  By contrast, Defendant's Motion for Summary
Judgment contends the decision to deny plaintiff's benefits
should be affirmed because substantial evidence exists in the
record to support the ALJ's decision that plaintiff was not
disabled within the meaning of the Act, and because the ALJ
applied the correct legal standards in reaching the decision.

## I.  PROCEEDINGS

On July 30, 2004, plaintiff filed an application for
disability insurance benefits ("DIB").  (Administrative Record
("R.") at 13, 51-61.)  In her application, plaintiff alleged
disability within the meaning of the Act, beginning May 1, 1998.
(Id. at 13, 51) due to her (1) Systemic Lupus Erythematosus
("SLE" of "lupus")[1] and (2) fibromyalgia.[2]  (Id. at 23B, 55, 382-

---

[1] Systemic Lupus Erythematosus (SLE) is a chronic,
multisystem inflammatory autoimmune disorder with common
manifestations including arthralgias, polyarthritis, vascular
headaches, skin rashes, recurrent pleurisy, pericarditis,
generalized adenopahty, fevers, malaise, anemia, chronic
infections, renal and hematological involvement.  The Merck
Manual of Diagnosis and Therapy 426-30 (Mark H. Beers, M.C. &
Robert Berkow, M.D., eds.)(17th ed. 1999).

[2] Fibromyalgia, also called myofascial pain syndrome or
fibrositis, is a rheumatological disorder characterized by
diffuse musculoskeletal pain, stiffness, paresthesias, non-
restorative sleep, and fatigue.  Symptoms include generalized
aching and muscle weakness, a feeling of exhaustion, wakefulness
at night, cognitive difficulties, and patient perception that
joints are swollen although joint examination is normal.
Harrison's Principles of Internal Medicine 1706 (Isselbacher,
Braunwald, Wilson, Martin, Fauci, Kasper eds.) (13th ed. 1994).
Symptoms are exacerbated by stress or anxiety, cold or damp
weather, and overexertion.  Uniform diagnostic criteria, set out
by the American College of Rheumatology, require patients to have

63.)  Defendant denied Plaintiff's application initially, and
again upon reconsideration. (<u>Id</u>. at 13.)  Plaintiff filed a
timely request for a hearing before an ALJ, and the hearing was
held on January 12, 2006. (<u>Id</u>.)  Plaintiff appeared at the
hearing, with representation, and gave oral testimony.[3]  (<u>Id</u>. at
13, 349-67.)

On June 22, 2004, the ALJ issued a decision finding that
plaintiff was not disabled within the meaning of the Act because
she did not have an impairment or combination of impairments that
met or medically equaled one of the listed impairments within the
meaning of 20 C.F.R. §§ 404.1520(d), 404.1525 or 404.1526.  (<u>Id</u>.
at 13-22.)  On November 4, 2007, plaintiff requested that the
Social Security Appeals Council ("Appeals Council") review the
ALJ's decision.  (<u>Id</u>. at 9.)  The Appeals Council denied
plaintiff's request for review on January 25, 2008, thereby
rendering the ALJ's decision final.  (<u>Id</u>. at 5-7.)  Pursuant to
42 U.S.C. § 405(g), plaintiff, having exhausted her
administrative remedies, timely filed the instant action for
judicial review.

---

widespread pain in combination with at least 11 of 18 specific
tender points.  <u>Id</u>.
[3]

II.   <u>FACTS OF RECORD</u>

A.   <u>Plaintiff's Personal Background</u>

Born on February 1, 1957, plaintiff is now 51 years old and was 46 years old on the date last insured. (R. at 21, 51; Plaintiff's Motion for Summary Judgment 3.)  Plaintiff completed high school and two years of college classes before beginning work.  ®. at 21, 351.)  Plaintiff worked as a leasing consultant for West Gate Apartments in Manassas, Virginia for approximately five years. (<u>Id</u>. at 352-53.)  Prior to her employment at West Gate Apartments, plaintiff worked at various part-time jobs, including approximately two years during the early 1990s performing data entry for an insurance company. (<u>Id</u>. at 353-55.) Plaintiff did not engage in any substantial gainful activity after May 1998. (<u>See Id.</u> at 15.)  Additionally, the ALJ determined plaintiff was unable to perform her past relevant work as a data entry clerk and leasing consultant because those jobs subjected plaintiff to more than a low stress routine and exposed plaintiff to temperature extremes, among other reasons. (<u>Id.</u> at 21.)

The ALJ further determined that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2003, which is her date last insured ("DLI"). (<u>Id.</u> at 15.)

B.  <u>Plaintiff's Medical History</u>

The evidence shows plaintiff has two medically determinable impairments in the relevant time period: (1) fibromyalgia, a muscle disorder (<u>Id</u>. at 15, 145, 228, 231, 234, 266, 269, 301) and (2) systematic lupus erythematosus (SLE).  (R. at 15-17, 107-10, 112-22, 138-39, 141-42, 145-48, 269-72, 275, 278, 301, 304.)

1.  <u>Systematic Lupus Erythematosus and Fibromyalgia</u>

Plaintiff has a history of treatment for SLE since 1995. (<u>Id.</u> at 15-17.)  Most of plaintiff's medical treatment has been through Kaiser Permanente.  Plaintiff has had various primary care physicians and has been treated by rheumatologist Margaret Fisher, M.D.[4] since 1995.  (<u>Id</u>. at 23, 335-44, 366; Plaintiff's Motion for Summary Judgment 3.)  The administrative transcript includes plaintiff's treatment records from Kaiser Permanente dated from May 2001 through March 2005, before and after the relevant time period.  (<u>Id</u>. at 62-227.)

On May 10, 2001, Dr. Ivan Lim, who is associated with Kaiser Permanente, evaluated plaintiff.  (<u>Id</u>. at 148.)  Plaintiff reported "off and on" shoulder pain, without a precipitating injury.  (<u>Id</u>.)  Upon examination, plaintiff exhibited no focal tenderness or joint swelling.  (<u>Id</u>.)  Dr. Lim noted that

---

[4] In her Motion for Summary Judgment, plaintiff states that she has been treated by a rheumatologist named Barbara Fisher. (Plaintiff's Motion for Summary Judgment 3.)  Upon examination of the record, it appears that the rheumatologist's name is Margaret Fisher.

plaintiff's SLE was "stable" and he prescribed Relafen and Nifedipine. (Id.) On May 14, 2001, plaintiff called Dr. Lim's office to report a reaction to Relafen. (Id. at 147.) Dr. Lim substituted a tapering dose of Prednisone for the Relafen. (Id.)

On June 23, 2001, plaintiff went to Kaiser Permanente Urgent Care with complaints of chest pain and was told she had "inflammation of the ribcage." (Id. at 142, 144-45.) She then saw Dr. Lim for a follow-up visit on June 28, 2001. (Id. at 142.) Plaintiff's EKG was normal and she reported that the chest pain was better and that she no longer had focal tenderness over the sternum. (Id.) Dr. Lim's impression was SLE with pleuritis and he re-started plaintiff on Prednisone. (Id.)

On August 9, 2001, plaintiff complained of chest pain, mild tenderness over the rib cage and neck pain that subsided with cold compress. (Id. at 141.) Plaintiff reported that she had cut the dose of Prednisone on her own because she was "swelling up" and gaining weight. (Id.) Dr. Lim noted that plaintiff's SLE was stable and her physical examination was normal. (Id.) He refilled plaintiff's Norflex prescription and directed plaintiff to continue taking her other medications as prescribed. (Id.)

On September 10, 2003, plaintiff saw Dr. Fisher and presented with joint and back pain, fatigue, insomnia, depression, headaches and some GI upset. (Id. at 100.) Dr.

Fisher noted diagnoses of lupus, fibromyalgia and depression.
(Id.)  Upon examination, plaintiff had multiple tender points of
fibromyalgia.  (Id.)  Plaintiff's chest was clear and she had no
adenopathy, masses or thyromegaly in the neck.  (Id.)  Dr. Fisher
suggested that plaintiff try Prozac for the depression and
consider increasing the dosage of Prednisone.  (Id.)  Plaintiff
was directed to return to the clinic for a follow-up visit in one
month.  (Id.)

During an October 2003 visit to Dr. Fisher's office,
plaintiff indicated that she was feeling much better; the
depression present in September was under control and she had
"much less pain."  (Id. at 94.)  Plaintiff further reported that
she was walking daily and was off the Prednisone.  (Id.)
Plaintiff had some pain her in right ear and complained of
swelling and pain her left shoulder.  (Id.)  Dr. Fisher directed
plaintiff to continue taking the Prozac and return to the clinic
in three months.  (Id.)

In February 2004, plaintiff returned to Dr. Fisher's office
complaining of swelling in her head and shoulder, dizziness and
body aches.  (Id. at 88.)  Dr. Fisher's notes indicate that
plaintiff was feeling "a lot better," was less depressed and
working out regularly.  (Id.)  Dr. Fisher noted that plaintiff's
SLE was "controlled" and instructed plaintiff to return for a
follow-up visit in six months.  (Id.)

7

Plaintiff went to the urgent care center on November 11, 2004 and was seen by Dr. Nushin Todd. (<u>Id</u>. at 71.) Plaintiff reported exacerbation of the SLE and complained of mild swelling of her left leg and calf tenderness, but denied having numbness, tingling, redness or decreased strength in her leg. (<u>Id</u>.) Dr. Todd's notes also indicate that plaintiff was tearful and reported that her son had been killed in a motor vehicle accident the previous month. (<u>Id</u>.) Plaintiff had a follow-up appointment with Dr. Fisher on November 30, 2004, the day after her visit to urgent care. (<u>Id</u>. at 70-71.) Plaintiff re-iterated the complaints of pain and swelling in her left leg and indicated that the pain worsened when she walked. (<u>Id</u>. at 71.) In addition, plaintiff reported difficulty sleeping after the death of her eighteen-year-old son and indicated that she was seeing a counselor. (<u>Id</u>.) Dr. Fisher's notes indicate that plaintiff's leg pain was likely due to sciatica and was a "grief reaction." (<u>Id</u>.) Plaintiff was instructed to do back exercises, was given Robaxin and Ambien and was sent for x-rays. (<u>Id</u>.) The x-rays, taken December 3, 2004, indicated that plaintiff's back and leg were normal. (<u>Id</u>. at 70.)

On January 26, 2005, plaintiff had an initial visit with Dr. David A. Smith. (<u>Id</u>. at 68.) Plaintiff's chief complaint was neck and chest pains. Dr. Smith noted tenderness in plaintiff's chest wall and spine. (<u>Id</u>.) Plaintiff's lungs were clear and

8

she had a regular heart rate.  (Id. at 69.)  Dr. Smith's
diagnosis was costochondritis and myalgias and he recommended
stretching exercises, heat and massage as well as a physical
therapy consultation.  (Id.)  On February 15, 2005, plaintiff saw
a physical therapy specialist who noted that plaintiff had been
diagnosed with fibromyalgia in 1995.  (Id. at 66-67.)  Plaintiff
asked that the physical therapist show her how to "do something
for the pain."  (Id. at 67.)  The physical therapist's noted that
plaintiff presented with poor posture to upper trunk and neck,
which were causing pain and exacerbating the symptoms of
fibromyalgia.  (Id.)

On March 9, 2005, plaintiff saw Dr. Fisher for a follow-up
appointment regarding the SLE.  (Id. at 63.)  During this visit,
plaintiff reported that she was feeling a lot of pain, including
in her left shoulder, occiput, knees, legs, back and chest, and
although the Robaxin helped with the pain, it made her "feel
odd."  (Id.)  Plaintiff also reported that she was "unable to
function well," was not exercising, and had been turned down for
disability.  (Id.)  Dr. Fisher prescribed Prednisone and told
plaintiff to call with an update in seven to ten days and to
return for a follow-up visit in one month.  (Id.)

Plaintiff had a comprehensive visit with Dr. Fisher on
December 14, 2005.  (Id. at 269-71.)  At the time of the visit,
plaintiff had been off of Prednisone for one month and reported

that she had the "usual pain all over," especially in her neck. (<u>Id</u>. at 270.)  Dr. Fisher's notes indicate that plaintiff was not exercising, was applying for disability and had not worked in many years.  (<u>Id</u>.)  Plaintiff reported that, on "good or mediocre days," she could walk half an hour, stand 20-30 minutes, sit an hour at a time, could be "up and functioning for about three hours out of a nine hour day, and napped for an hour.  (<u>Id</u>.)  On bad days, plaintiff showered and remained in bed.  (<u>Id</u>.) Plaintiff reported that half her days are bad and that it takes a couple hours to get out of the house in the morning.  (<u>Id</u>.)  Dr. Fisher's notes indicate that she assessed plaintiff's SLE as "stable" and recommended plaintiff continue to take Plaquenil and Naprosyn as needed and engage in cardiovascular exercise.  (<u>Id</u>. at 271.)  Plaintiff was directed to return to the clinic in four months.  (<u>Id</u>.)

On December 30, 2005, Dr. Fisher completed an assessment of plaintiff's SLE and fibromyalgia at the request of counsel.  (<u>Id</u>. at 335-42.)  Dr. Fisher's report indicated that plaintiff has SLE affecting her joints and respiratory system (pleurisy) as well as signs of severe fatigue, fever, malaise and weight loss.  (<u>Id</u>. at 337.)

### 2.   Other Maladies

On June 6, 2002, plaintiff underwent a breast biopsy.  (<u>Id</u>. at 127-32.)  No mass, lesion or palpable adenopathy was found.

10

(<u>Id</u>.)  On July 15, 2002, plaintiff complained of a sore throat and neck gland swelling.  (<u>Id</u>. at 125.)  She was diagnosed with an upper respiratory infection with lymphadenopathy and was prescribed Augmentin.  (<u>Id</u>.)

On August 11, 2002, plaintiff went to an urgent care center complaining of fatigue and vertigo.  (<u>Id</u>. at 118.)  In October 2002, she was seen for pharyngitis, sinusitis, dysphagia, swollen glands and ear pain.  (<u>Id</u>. at 114-15.)  Plaintiff was given a throat culture and directed to use throat lozenges and spray and to gargle with salt water.  (<u>Id</u>. at 114.)  She was also treated with Augmentin and Humibid.  (<u>Id</u>.)  In November 2002, plaintiff returned for a follow-up visit regarding recurrent congestion. (<u>Id</u>. at 112.)  Plaintiff did not have pain or a fever and was given Claritin, Humibid and nasal spray.  (<u>Id</u>.)

A state agency psychologist, A. John Kalli, Ph.D, completed a Psychiatric Review Technique Form regarding plaintiff on March 10, 2005.  Based upon his review of the record, Dr. Kalli concluded that plaintiff did not have a severe mental impairment on December 31, 2003, her date last insured.  (<u>Id</u>. at 235-47.) Dr. Kalli further noted that plaintiff's mental status was normal and that she responded well to Prozac.  (<u>Id</u>. at 247.)

On November 7, 2005, plaintiff was diagnosed with rotator cuff syndrome after reporting two months of pain.  (<u>Id</u>. at 283.)

11

Plaintiff received a steroid injection, which she tolerated well. (<u>Id</u>.)

On November 30, 2005, plaintiff was treated for complaints of neck pain, headaches and pain in her left leg. (<u>Id</u>. at 279-81.) Plaintiff stated that she had been going to physical therapy for her neck. (<u>Id</u>. at 279.) Plaintiff was diagnosed with sinusitis and given nasal spray and antibiotics. (<u>Id</u>. at 280-81.) Additionally, x-rays were ordered to evaluate the cause of the leg pain. (<u>Id</u>. at 281.) After the x-rays, plaintiff was informed that the pain was not likely due to the lupus and physical therapy was recommended. (<u>Id</u>. at 278.)

C.   <u>January 12, 2006 ALJ Hearing</u>

1.   Plaintiff's Testimony

At her hearing, plaintiff testified to the following information. At the time of the hearing she was 48 years old, had completed two years of college and had first gotten sick in 1995. (R. at 351-52.) Plaintiff had not worked since May 1998. (<u>Id.</u> at 352.) Plaintiff further testified that she had been married for 22 years, lived with her husband and seven-year-old son. (<u>Id</u>. at 356.) Plaintiff had two children; the first child was born in 1986 and the second was in 1998. (<u>Id</u>.) Plaintiff's older son was killed in a car accident in 2004. (<u>Id</u>.)

Plaintiff testified that it took her a long time to get going in the morning. (<u>Id</u>. at 357.) She prepared light meals

12

and was sometimes able to do minimal household chores, such as dusting and making her side of the bed.  (Id. at 357-58.) Plaintiff was usually able to drive except on bad days.  (Id. at 359.)  She described "bad days" as those with a lot of pain and stated that she had about four or five bad days a month.[5] (Id. at 365.)  On bad days, she showered and got back in bed for four hours and then usually spent four hours sitting up.  (Id. at 366.)

Most of the time, plaintiff was able to do some walking and frequently walked to the bus stop to pick up her son after school, but was unable to collect her son on bad days.  (Id. at 359.)  Plaintiff read frequently, including the Bible, novels, magazines and the newspaper.  (Id.)  She also used the internet, watched tv and listened to the radio.  (Id.)  Plaintiff was able to do light shopping and went to church regularly.  (Id. at 360.) She was a member of a telephone prayer line.  (Id.)

Plaintiff had not been hospitalized or had surgery since she stopped working in May 1998.  (Id. at 361.)  She testified that her medications included Plaquenil and Naprosyn and that she was took Prednisone sporadically.  (Id. at 362.)  The side effects of the various medications included dry mouth, dry eyes, and weight gain.  At the time of the hearing, plaintiff had been on and off

---

[5] Plaintiff further testified that Dr. Fisher had concluded that fibromyalgia was the cause of the "bad days."  (Id. at 366.)

antibiotics for sinus problems.[6]  (Id. at 362-63) Plaintiff also testified to having bouts of depression, for which she periodically took Prozac.[7]  (Id. at 363.)  During the depression episodes, plaintiff had crying spells and kept mostly to herself. (Id. at 367.)

2.  Vocational Expert's Testimony

At the hearing, the testimony of the Vocational Expert ("VE"), Dr. Leviton, revealed the following information. Plaintiff's past relevant work as a data entry clerk was sedentary, semiskilled work and her past work as a leasing consultant was light, skilled work.  The required skills would be of a clerical nature, such as reporting, recording, communicating and scheduling.  (R. at 369.)

The ALJ asked VE Leviton to consider a hypothetical worker of plaintiff's age, education and vocational background.  (Id. at 369-71.)  In his hypothetical, the ALJ asked VE Leviton to list

---

[6] Plaintiff further testified she had learned at her last lupus check-up that sinus problems can be part of fibromyalgia. (Id. at 362-63.)

[7] Plaintiff stated that she had had symptoms of depression for about as long as she had been sick with fibromyalgia and SLE. (Id. at 367.)  She further stated that Dr. Fisher had instructed that taking Prozac would "help ... with the pain[,]" but when she took Prozac, plaintiff did not feel like herself.  (Id.)

14

medium, light and sedentary jobs that would be limited by the following, increasingly-restrictive factors:[8]

(1) the need for low stress work with moderate attention, concentration and persistence of pace[9];

(2) moderate pain that causes moderate limitations in performing on a schedule, maintaining attendance or completing a normal day of work without unreasonable rest periods;

(3) an inability to kneel;

(4) mild limitations in working with others;

(5) no upper extremity lifting or carrying;

(6) no lower extremity use, but having the capability to stand and walk for four out of eight hours and to sit for six out of eight hours;

(7) standing and walking for two out of eight hours;

(8) sitting for six out of eight hours with the option to sit or stand every 30 minutes;

(9) sitting or standing at the individual's discretion; and

_____

[8] Before listing the additional factors, the ALJ instructed the VE to assume that the hypothetical worker would be unable to climb ladders, ropes and scaffolds, ascend to hazardous heights, move hazardous machinery, and/or be exposed to extreme temperature changes. (Id. at 370.)

[9] The VE was instructed to assume occasional ability as to climbing stairs and ramps, balancing, stooping, crouching, and kneeling as well as no ability to crawl. (Id. at 370.) Additionally, for the first factor, the VE was instructed to assume moderate pain with moderate limitations as to performing activities within a schedule, maintaining regular attendance and "being punctual within customary tolerances." (Id.)

15

(10) that the above limitations resulted from moderate pain. (<u>Id</u>. at 370-71.)

In response, Dr. Leviton testified that the limitations listed in the first hypothetical factor would result in the following possible jobs for plaintiff:

(1) medium, unskilled level:

(a) kitchen helper, with 127,000 jobs nationally and 600 locally;

(b) sandwich maker, with 52,000 jobs available nationally and 600 locally; and

(c) assembler, with 54,000 jobs nationally and 450 locally.

(2) light, unskilled level:

(a) office helper, with 150,000 jobs nationally and 1,800 locally;

(b) non-post office mail clerk, with 43,000 jobs nationally and 500 locally; and

(c) cashier, with 960,000 jobs nationally and 2,800 locally.

(3) sedentary, unskilled level:

(a) food and beverage order clerk, with 200,000 jobs nationally and 3,500 locally;

(b) charge account clerk, with 39,000 jobs nationally and 600 locally; and

16

(c) surveillance system monitor, with 12,000 jobs nationally and 900 locally.

(Id. at 371-72.)  According to VE Leviton, the number of available jobs would continue to decrease with each increasingly-restrictive factor from the hypothetical.  (Id. at 372.) Medium work could be eliminated altogether by the factors and light work could be decreased by 50 percent or more.  (Id.)  Dr. Leviton further testified that if all of the limitations were considered, work on a full-time sustained basis might not be possible.  (Id. at 373.)  Moreover, VE Leviton stated in response to questioning by plaintiff's counsel that there would be a loss of productivity and possibly no work for an individual who would be unable to attend work unexpectedly four to five times per month. (Id.)

### III.   APPLICABLE LAW

To be found disabled, a claimant must have:

an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve months.

42.  U.S.C. § 423(d)(1)(A).  See also 20 C.F.R. § 404.1505(a).

Defendant's regulations require an ALJ to evaluate a person's claim for disability insurance benefits under a five-step sequential process (the "process"). 20 C.F.R. §§ 404.1520(a); Reichenbach v. Heckler, 808 F.2d 309, 311 (4th Cir. 1985).  The process requires Defendant to consider whether a

17

claimant: (1) is currently engaged in substantial gainful activity[10]; (2) has a medically determinable impairment that is "severe" or a combination of impairments that is "severe"[11]; (3) has an impairment that meets or equals the requirements of a "listed" impairment;[12] (4) has the residual functional capacity[13]

---

[10] Substantial gainful activity (SGA) is defined as work activity that involves doing significant mental or physical activities and work that is usually done for pay or profit, whether or not a profit is realized.  (20 C.F.R. § 404.1572(a)-(b).; R. at 14.) If an individual engages in SGA, she is not disabled regardless of who severe her physical or mental impairments are and regardless of her age, education and work experience.  (R. at 14.)  If the individual is not engaging in SGA, the analysis proceeds to the second step.  (Id.)

[11] An impairment or combination of impairments is "severe" within the meaning of defendant's regulations if the impairment significantly limits an individual's ability to perform basic work activities.  (R. at 14.)  An impairment is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work.  (Id.; 20 C.F.R. § 404.1521.)  If the individual does not have a severe medically determinable impairment, she is not disabled, but if she does have a severe impairment, the analysis proceeds to the third step.  (Id.)

[12] A "listed" impairment is one that exists in the list and produces the associated symptoms contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant can satisfy step three by showing that she has a listed impairment or that she has more than one impairment that, when combined, result in symptoms of equal severity and duration as a listed impairment.  20 C.F.R. § 404.1523.  If the individual's impairment or combination of impairments meets or equals the criteria of a listing and meets the duration requirement outlined in 20 C.F.R. § 404.1509, the claimant is disabled.  (R. at 14.)  If the impairment does not meet or equal the criteria, the analysis proceeds to the next step.  (Id.)

[13] As part of step four, the ALJ must determined the claimant's residual function capacity ("RFC") as outlined in 20

18

to return to her past work;[14] and (5) if not, whether she can

perform other work in the national economy.[15]   (R. at 14-15.)

Although the claimant bears the burden of proving disability, a

limited burden shifts to the defendant in the last step.  (Id. at

15.)   In order to support a finding that the individual is not

disabled, defendant must provide evidence demonstrating that

other work exists in significant numbers in the national economy

that plaintiff can do, given plaintiff's RFC, age, education and

work experience.[16]   (Id.; 20 C.F.R. §§ 404.1512(g) and

C.F.R. § 404.1509.  An individual's RFC is her ability to do
physical and mental work activities on a sustained basis despite
limitations from her impairments.  (R. at 14.)   In determining
the RFC, the ALJ must consider all of the individual's
impairments, including impairments that are not severe.  (Id.; 20
C.F.R. §§ 404.1520(e) and 404.1545.)

[14]  Past relevant work is worked performed, either as the
claimant actually performed it or as it is generally performed in
the national economy, within the last 15 years or 15 years prior
to the date that disability must be established.  (R. at 15.)
The past relevant work must have lasted long enough for the
individual to have learned to do the job and have been SGA.
(Id.; 20 C.F.R. §§ 404.1560(b) and 404.1565.)   If the plaintiff
has the RFC to do her past relevant work, she is not disabled,
but if she is unable to do any past relevant work, the analysis
proceeds to the next step.  (Id.)

[15]  In making this last determination, the ALJ must take the
individual's age, RFC, education and work experience into
account.  (R. at 15.)   If the individual is able to do other
work, she is not disabled.  (Id.)   If the individual is not able
to do other work and meets the duration requirement, she is
disabled.  (Id.)

[16]  Defendant may meet the burden of showing other jobs
through use of the Medical-Vocational Guidelines of the
regulations or through the testimony of a vocational expert.  (20
C.F.R. Part 404, Subpart P, Appendix 2.)   Where plaintiff's RFC

19

404.1560(c).) In this case, there is the additional issue of whether plaintiff was "disabled" within the meaning of the Act on or before December 31, 2003, her date last insured.  See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005)(to qualify for DIB, claimant must prove that she became disabled prior to the expiration of her insured status).

## IV.   STANDARD OF REVIEW

This Court may not review defendant's decision de novo, but instead must determine whether defendant's decision is supported by substantial evidence in the record and whether defendant applied the correct law.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  If so, then defendant's findings are "conclusive," even if this Court believes defendant's assessment of the record was incorrect.  42 U.S.C. § 405(g); Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); see also Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966) (It is not "our function to substitute our judgment for that of the Secretary if his decision is supported by substantial evidence.").

---

is affected by factors which may not be reflected in the criteria of the Medical-Vocational Guidelines, the ALJ may need to obtain evidence from a VE to ascertain specific jobs which would accommodate the individual's RFC.

"Substantial evidence in the record" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "consists of more than a mere scintilla . . . but may be somewhat less than a preponderance" of evidence. Hays, 907 F.2d at 1456 (internal citations and quotation marks omitted).  The correct law to be applied includes the SSA, its implementing regulations, and controlling case law.  See Coffman, 829 F.2d at 517-518.  With this standard in mind, this Court next evaluates the ALJ's findings and decision.

## V.  ALJ's FINDINGS AND DECISION

In this case, the ALJ made the following findings. Plaintiff last met the insured status requirements of the Act on December 31, 2003, but failed to meet her burden of establishing that she was disabled on or before her date last insured.  (R. at 15, Finding 1.)  Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Id., Finding 2.)  Through the date last insured, plaintiff's muscle disorder and SLE were severe impairments under 20 C.F.R. § 404.1520(c), but did not meet or equal a listed impairment under 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  (Id. at 15-17, Findings 3-4.)  Although plaintiff may have the criteria developed by the American College of Rheumatology for a diagnosis of SLE, she does not have the signs and symptoms as set forth in Section 14.02A (1-11) or 14.02(B).  (Id. at 17.)  Plaintiff's musculoskeletal

impairments do not meet the requirements of the impairments in
Section 1.00 (Musculoskeletal System)or Section 1.02 (Major
Dysfunction of a Joint(s)).  (<u>Id</u>.)

     The ALJ further determined that plaintiff has the following
functional limitations.  She can lift ten pounds frequently and
20 pounds occasionally.  She cannot climb ladders, ropes and
scaffolds.  She must avoid working around hazardous heights and
hazardous machinery and also must avoid exposure to extreme
temperature changes.  Due to SLE and some depression, plaintiff
requires low stress routine work, which is work requiring no more
than moderate attention, concentration, persistence and pace for
prolonged periods.  She can occasionally climb stairs and ramps,
balance, stoop, crouch and kneel, but cannot be engaged in work
that requires crawling.  Plaintiff must avoid exposure to dust,
fumes, chemicals, poor ventilation, excessive humidity, wetness
and excessive vibration.  She experiences moderate pain with
moderate limitations as to performing activities within a
schedule, maintaining regular attendance and being punctual
within customary tolerances.  Additionally, plaintiff has
moderate limitations as to completing a normal workday or
workweek without rest periods of unreasonable length and
frequency.  Thus, the ALJ concluded that plaintiff has the RFC to
perform less than a full range of light level work.  (<u>Id</u>. at 18,
Finding 5.)  Through the DLI, plaintiff was unable to perform any

past relevant work.  (<u>Id</u>. at 21, Finding 6.)  Her past relevant work as data entry clerk and leasing consultant exposed her to more than a low stress routine as well as exposure to temperature extremes.  (<u>Id</u>.)

Plaintiff was born on February 1, 1957 and was 46 years old on the DLI, which is defined as a younger individual (age 45-49) under 20 C.F.R. § 404.1563.  (<u>Id</u>., Finding 7.)She has at least a high school education and is able to communicate in English, under 20 C.F.R. § 404.1564.  (<u>Id</u>., Finding 8.)  Under 20 C.F.R. § 404.1568, plaintiff acquired work skills from her past relevant work.  (<u>Id</u>., Finding 9.)  Specifically, as a leasing consultant, plaintiff showed apartments and townhouses to customers interested in leasing.  She helped customers complete applications and checked their credit using a computer.  This job required a lot of standing and walking.  (<u>Id</u>.)  As a result of her past relevant work as a data entry clerk, plaintiff acquired transferable clerical skills, such as recording, reporting, scheduling and communication skills.  (<u>Id</u>.)  The work skills plaintiff acquired from her past relevant work were transferable to other occupations with jobs existing in significant numbers in the national economy, under 20 C.F.R. §§ 404.1560(c), 404.1566 and 404.1568(d).  (<u>Id</u>., Finding 10.)  Considering plaintiff's age, education, work experience, and RFC, the ALJ concluded that plaintiff has been and is capable of making a successful

adjustment to other work that exists in significant numbers in the national economy. (<u>Id</u>. at 22.)  Although plaintiff's functional limitations prevent her from being able to perform the full range of light work, the ALJ concluded that plaintiff is not disabled after considering her age, education, and transferable work skills. (<u>Id</u>.)  Thus, plaintiff was found to not be under a disability at any time through the date last insured, under 20 C.F.R. § 404.1560(g). (<u>Id.</u> at 22, Finding 11.)

A.   <u>Residual Functional Capacity</u>

1.   <u>RFC Determinations For Physical Impairments</u>

Residual functional capacity plays an important role in the five-step evaluative process.  At the Administrative Law Judge hearing, the ALJ has the responsibility for assessing the claimant's RFC.

If a claimant has an impairment that does not meet or equal a listed impairment under step three, but that is nevertheless "severe," then defendant must assess the claimant's RFC for use in steps four and five.  20 C.F.R. § 404.1520(e).  This rule operates to give due consideration to claimants whose impairments fall somewhere between steps two and three of the process. Otherwise, a finding of a listed impairment would automatically result in a "disabled" determination, while a finding that a claimant's impairment is "not severe" would automatically result

24

in a "not disabled" determination under the Act.  20 C.F.R. §§
404.1520(a)(4)(ii), (iii).

An RFC of "medium" duty work involves "lifting no more than
50 pounds at a time with frequent lifting or carrying of objects
weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  If someone
can do medium work, she can also do sedentary and light work.
Id.  An RFC of "light" duty work involves "lifting no more than
20 pounds at a time with frequent lifting or carrying of objects
weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  Sedentary
work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying light articles and small tools.
20 C.F.R. § 404.1567(a).  Sedentary jobs require occasional
standing and walking.  id.

The Social Security Administration has defined the frequency
terms "occasionally" and "frequently."  "'Occasionally' means
occurring from very little up to one-third of the time."  Soc.
Sec. Rul. 83-10.  "'Frequently' means occurring from one-third to
two-thirds of the time."  Id.

    2.   The ALJ's RFC Determination

In this case, plaintiff argues the ALJ improperly rejected
Dr. Fisher's opinions and assessments of plaintiff's functional
limitations and that the ALJ's findings regarding plaintiff's RFC
are inconsistent with the evidence in the record.  (Pl.'s Memo
13-19.)  Specifically, plaintiff claims that the ALJ should have

given Dr. Fisher's opinion controlling weight, improperly found that plaintiff's SLE does not meet the level of severity set out in the List of Impairments, and reached a conclusion about plaintiff's RFC that is not consistent with the evidence and requirements set out in the regulations.

First, plaintiff avers that the ALJ arbitrarily rejected Dr. Fisher's opinions regarding plaintiff's specific work-related limitations.  In the explanation of plaintiff's RFC in Finding 5, the ALJ noted that he did not give controlling weight to Dr. Fisher's opinion because the progress reports, treatment notes and physical examination findings included in the record did not support the symptoms as Dr. Fisher described them.  (R. at 19, Finding 5.)  Such a conclusion is not improper under the circumstances present in this case. Controlling weight is given to a treating source's opinion of the nature and severity of a claimant's impairments if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record.  20 C.F.R. 1527(d)(2).

In this case, the ALJ considered Dr. Fisher's opinions and found some of them to be inconsistent with other evidence from the record.  Specifically, according to the treatment notes and physical examination findings in the record, plaintiff was never in acute distress during her doctor visits nor did she report

incidents of acute distress to her doctors.  (R. at 20, Finding 5.)  Plaintiff's heart rate and rhythm were always normal and her lungs were clear upon most examinations.  She had no spinal tenderness and her hands, wrists, elbows and shoulders were usually all normal.  (<u>Id</u>.)  During the episodes when plaintiff did experience flare ups, they were always of short duration and plaintiff improved with conservative treatment.  (<u>Id</u>.)  Although plaintiff had some tenderness when she experienced a flare up of SLE symptoms, she continued to have good range of motion, if not full range, and remained neurologically intact with good muscle strength.  (<u>Id</u>.)

Such findings are based on generous amounts of information present in the record.  Moreover, the progress reports and treatment notes in the record provide significantly more helpful information in evaluating plaintiff's limitations than the SLE questionnaire that Dr. Fisher filled out, which consists mostly of checkmarks and little explanation.  (R. at 336-37.)  In response to question number 3, Dr. Fisher checked "yes" when asked if plaintiff experienced severe fatigue, fever, malaise, and weight loss.  (<u>Id</u>. at 337.)  However, the treatment notes do not indicate that plaintiff suffered from frequent fevers and expressly demonstrate that plaintiff struggled more with weight gain than with weight loss.  For example, plaintiff, on her own, reduced the amount of Prednisone she ingested on more than one

27

occasion, including in August 2001 when she reported cutting the dose because she was swelling up and gaining weight. (<u>Id</u>. at 141.)  The evidence in the record also indicates that plaintiff's SLE was stable on medication, with occasional flare ups that responded well to medication, including over the counter remedies such as Motrin.  (<u>Id</u>. at 105, 108, 124, 141.)

Dr. Fisher also noted on the SLE questionnaire that plaintiff's respiratory system was affected by the SLE in that plaintiff had pleurisy.  (<u>Id</u>. at 336.)  However, nothing in the record suggests that plaintiff was ever treated for acute respiratory distress or seen at the hospital for such a complaint.  Plaintiff appears to have had two flare ups involving pleurisy in 2001 and 2003.  On both occasions, plaintiff responded quickly to medication.  In June 2001, plaintiff was seen at Kaiser Permanente Urgent Care for complaints of pain in her chest.  Treatment notes in the record indicate that her chest was tender, her lungs were clear and her EKG was normal. (<u>Id</u>. at 146.)  The treating physician re-started plaintiff on Prednisone. (<u>Id</u>. at 142.)  In March 2003, plaintiff had a follow-up visit for a flare up of SLE with pleurisy.  (<u>Id</u>. at 108.)  The treatment notes from the visit indicate that an x-ray revealed a marked improvement and that plaintiff denied any shortness of breath. (<u>Id</u>.)  Additionally, plaintiff's own testimony at the hearing before the ALJ includes no mention of breathing difficulty.

Moreover, Dr. Fisher's own treatment notes in the record are at times inconsistent with her questionnaire answers.  For example, during a follow-up visit with plaintiff, Dr. Fisher noted that plaintiff's SLE was stable and suggested that plaintiff continue with the medication dosages she was taking and engage in cardiovascular exercise.  (Id. at 271.)

In determining plaintiff's RFC, the ALJ also considered the medical source opinions provided by, Dr. William C. Amos, a non-examining State agency medical consultant.[17]  Defendant's regulations provide that the medical opinions of State agency medical and psychological consultants may not be ignored and can be given weight if supported by evidence in the record.  20 C.F.R. § 404.1527(f)(2)(i).  In reaching his conclusions regarding plaintiff's functional abilities and limitations, Dr. Amos considered plaintiff's medical history, the character of her symptoms and her daily living activities.  (R. at 228-31.)  Dr. Amos specifically noted in his report that plaintiff did not attend regular physical therapy and did not require an assistive device to ambulate.  (Id. at 230.)  These findings are consistent with other evidence in the record and it was not improper for the ALJ to consider Dr. Amos' conclusion.  Notably, the ALJ's

---

[17] The ALJ also considered the opinions of Dr. A. John Kalil, Ph.D., the State agency psychological consultant, who opined that plaintiff did not have a severe mental impairment as of her date last insured.  (R. at 235-47.)  Plaintiff does not challenge the determinations regarding her mental state.

29

determination regarding plaintiff's RFC differs from that of Dr. Amos's conclusions in that the ALJ found plaintiff to have less capacity for physical exertion than did Dr. Amos.

The ALJ provided the reasons for his decision regarding plaintiff's RFC in the explanation of Finding 5.  (Finding 5, at 18-20,.) Upon consideration of those reasons and the evidence in the record, the undersigned concludes that the ALJ's decision not to give controlling weight to Dr. Fisher's questionnaire answers was not improper.

Plaintiff also contends that the ALJ did not give sufficient attention to plaintiff's fibromyalgia.  Specifically, plaintiff appears to take issue with the ALJ's reference to plaintiff's fibromyalgia as a "muscle disorder."  (Pl.'s Memo 15.)  This argument appears to be largely one of semantics.  The Court notes that the ALJ explicitly stated in the first paragraph of the explanation of Finding 4 that "specific attention was given to section 14.02 (Systematic Lupus Erythematosus)," but in the next paragraph addresses plaintiff's "musculoskeletal impairments." (R. at 17, Finding 4.)  Notably, plaintiff does not contest the ALJ's conclusion that plaintiff is able to ambulate and perform fine and gross movements effectively.  Such ability renders plaintiff unable to meet the requirements of any of the musculoskeletal impairments listed in Section 1.00 (Musculoskeletal System) or Section 1.02 (Major Dysfunction of a

30

Joint(s) (due to any cause)), which were considered by the ALJ. (<u>Id</u>.)  Indeed, in her brief, plaintiff does not offer any other Section under which she contends her fibromyalgia should have been considered and evaluated.

Moreover, Dr. Fisher's fibromyalgia report, on which plaintiff relies heavily to support her arguments, also fails to elucidate the issue of plaintiff's fibromyalgia.  (<u>Id</u>. at 338-43.)  In response to question number 4, Dr. Fisher simply states that plaintiff's prognosis is "good," with no further explanation.  (<u>Id</u>. at 338.)  Additionally, this Court notes that Dr. Fisher left blank the section under 8(b) of the questionnaire, which asks the physician to describe the nature, frequency and severity of the patient's pain.  (<u>Id</u>. at 339.)  The absence of such information suggests that, in Dr. Fisher's opinion, the nature, frequency and severity of the pain plaintiff experienced as a result of fibromyalgia was minimal.  Dr. Fisher also failed to check an answer to question 12's query of whether the patient is limited in the ability to deal with work stress or to answer in any meaningful way question 14, which seeks information regarding plaintiff's functional limitations.  (<u>Id</u>. at 340.)

Notably, Dr. Fisher checked "yes" in response to question 9, which asks if emotional factors contribute to the severity of the patient's symptoms and functional limitation.  (<u>Id</u>.)  This answer

31

suggests that the symptoms plaintiff experiences are not solely due to fibromyalgia, but may be the result of, or at the very least exacerbated by, plaintiff's bouts with depression.  There exists in the record ample evidence indicating that plaintiff frequently responded well to Prozac, which improved her mood and lessened her symptoms generally when she continued to take it.

Plaintiff also contends that the ALJ improperly concluded that her fibromyalgia is a not severe impairment.  In Finding 3, the ALJ specifically states that, through the date last insured, plaintiff had two severe impairments: muscle disorder and SLE. Although the ALJ did not find that plaintiff's fibromyalgia alone to be of sufficient severity, he clearly took the combined effects of all of plaintiff's impairments and ailments into account and considered them together when reaching a determination of plaintiff's RFC.  Defendant's regulations authorize the ALJ to consider the effect of combinations of impairments and the ALJ properly did so in this case.  20 C.F.R. § 404.1523.

In explaining his conclusion in Finding 5 that plaintiff has the RFC to perform less than a full range of light work, the ALJ noted that plaintiff has multiple functional limitations. (R. at 18-20.)  Several of these limitations clearly are supported by the answers that Dr. Fisher's did provide in her report regarding plaintiff's fibromyalgia. (Id. at 338-42.)  For example, the ALJ

32

noted that plaintiff must avoid exposure to extreme temperature changes.  (Finding 5, at 18.)  Dr. Fisher's report identifies "cold" as one factor that precipitates plaintiff's pain.  (R. at 339.)  The ALJ further noted that plaintiff experienced moderate limitations due to fatigue.  (Finding 5, at 18.)  Similarly, Dr. Fisher's report indicates that fatigue is a symptom of plaintiff's fibromyalgia.  (R. at 339.)

While plaintiff may disagree with the level of severity that the ALJ attributed to her fibromyalgia, it is inaccurate to state that the ALJ did not consider those symptoms at all.  Indeed, he considered all of the symptoms presented to him and reached the conclusion that plaintiff possesses the RFC to perform less than a full range of light level work.[18]  Such a finding is not inconsistent with Dr. Fisher's reports and opinion or with the rest of the record.  The Court notes that despite plaintiff's own testimony regarding the nature and severity of her pain, there is little in the record to support the level of limitations that plaintiff claims to experience.  Notably, the record indicates that plaintiff's symptoms generally responded well to various medications.  The ALJ noted that if plaintiff's condition and

---

[18]  The Court is mindful of the fact that, under the regulations, if someone can do light work, she is generally also able to sedentary work, which typically requires less physical exertion.  20 C.F.R. § 404.1567.  Thus, possible jobs available to plaintiff include those requiring light work as well as those requiring sedentary work.

pain had been at the level that she claims, there would be greater evidence in the record to suggest a more acute severity or a much greater frequency of symptoms.  Indeed, the Court deems reasonable the ALJ's conclusion that the record would contain evidence of hospitalizations, emergency room visits, more frequent doctor appointments and pain medication increases if plaintiff's symptoms were as acute as she claims.  Under these circumstances, the Court concludes that substantial evidence exists in the record to support defendant's conclusion.

It appears plaintiff also argues that the ALJ's RFC determination failed to identify plaintiff's functional limitations as well as assess her work related abilities to sit, stand, walk and lift and, therefore, is inadequate.  (Pl.'s Memo 16-17.)  The Court already noted above that the ALJ's finding regarding plaintiff's RFC is supported by substantial evidence in the record.  The ALJ does not have to give equal weight to all of the evidence presented to him, especially when he is presented with conflicting evidence.  20 C.F.R. § 404.1527.  In this case, the ALJ had to sift through evidence that at times was conflicting.  After considering the evidence of the record, including medical reports, treatment notes, Dr. Fisher's reports and plaintiff's own testimony, the ALJ determined that plaintiff's medically determined impairments could have been reasonably expected to produce the alleged symptoms, but that

34

plaintiff's statements regarding the intensity, duration and limiting effects of her symptoms were credible only to extent that they were consistent with the other evidence in the record. (Finding 5, at 19.)  In reaching the conclusion regarding the intensity and level of plaintiff's symptoms, the ALJ considered plaintiff's own statements about her pain, the medical history provided in the record, laboratory findings, objective medical evidence of pain, plaintiff's daily activities and medical treatment that had been undertaken to alleviate plaintiff's pain. 20 C.F.R. § 404.1529(c).  The ALJ filled three pages with his conclusions about plaintiff's RFC.  (Finding 5, at 18-20.)  Thus, plaintiff's argument that the ALJ failed to adequately explain his findings is without merit.  Notably, the ALJ solely is responsible for making the RFC determination, not the treating physician or the plaintiff.  20 C.F.R. § 404.1546.  In this case, the ALJ made a RFC determination that is supported by substantial evidence in the record.

    B.   Available Jobs for Plaintiff

    Finally, plaintiff argues that the ALJ's finding that there are a significant number of jobs that plaintiff can perform is improper.  (Pl.'s Memo at 19-20.)  Plaintiff makes the bare assertion that VE testimony must be based on a consideration of all of the evidence in the record and in response to a proper hypothetical question setting forth all of plaintiff's

35

impairments, but cites no specific grievances with the ALJ's
decision in this case.  Instead, plaintiff appears to contend
that the ALJ's conclusion is improper because it does not rely
solely on the last hypothetical, posed at the hearing by
plaintiff's counsel, which asked the VE to estimate how many jobs
would be available for someone who had unpredictable absences
four to five times a month as well as "above moderate
limitations."  (Pl.'s Memo at 20.)  In Finding 10, the ALJ first
lists multiple jobs that plaintiff could perform at a light or
sedentary level.  (Finding 10, at 22.)  Then, he included
additional limitations and noted that the VE had testified that
there exists in the national economy a significant number of jobs
for such an individual possessing such limitations.  (Id.)  The
Court notes that, as plaintiff pointed out in her brief, the ALJ
is required to consider all of the evidence in the record and
weigh it as he sees fit.  Indeed, the ALJ posed a comprehensive,
multi-factor hypothetical to the VE.  In response, the VE
provided an answer that addressed the escalating severity of
limitations presented by the ALJ's increasing hypothetical
factors.  At the end, after the VE had considered all of the
factors outlined by the ALJ, the VE testified that there would
still be jobs available in the economy.  The Court concludes that
the ALJ's findings regarding the number of jobs available to
plaintiff was supported by substantial evidence.

36

## VI.   <u>RECOMMENDATION</u>

For the reasons set forth, the undersigned Magistrate Judge finds defendant's decision in this matter is supported by substantial evidence and does not contain legal error. Therefore, the Motion for Summary Judgment by defendant, Michael J. Astrue, Commissioner of Social Security, shall be GRANTED, and the Motion for Summary Judgment by plaintiff, Jane Williams, shall be DENIED.  An appropriate Order shall be issued.


_____/s/_____
THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE


May 19, 2009
Alexandria, Virginia

37